## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| JEAN FRANCOIS DAMON and JACQUELINE DAMON, | Civil No. 10-92 (JRT/FLN) |
| Plaintiffs, | |
| v. | |
| DANIEL GROTEBOER; MERL GROTEBOER; RE/MAX OF ROCHESTER; NORTHWEST EXECUTIVES BROKERAGE INC.; COMPARK, LCC; COMPARK 6-2, LLC; LOWELL PENZ; BRYAN SCHOEPPNER; JOHN WADE; EDWARD LUNN; DARREN GROTEBOER; ALAN SCHAFER *a/k/a* Joel Albert; JOEL ALBERTS *a/k/a* Joel Albert; JOEL S. LARSON; JEFFREY L. BIGLER *a/k/a* Jeff L. Bigler; KENNETH NASH; M&L PARTNERSHIP; TJ HALEY, LLC; 4 TP, LLC; JADCO PROPERTIES, *a Minnesota General Partnership;* JADCO PROPERTIES, LLC; SLB SERVICES; LLC, and DOES 1-10, | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

Steven J. Weintraut, **SIEGEL BRILL, PA**, 100 Washington Avenue South, Suite 1300, Minneapolis, MN 55401, for plaintiffs.

Christopher P. Renz, Nathan J. Knoernschild, David J. McGee, and Sarah B. Bennett, **THOMSEN & NYBECK, PA**, 3600 American Boulevard West, Suite 400, Bloomington, MN 55431, for defendants Daniel Groteboer, Merl Groteboer, RE/MAX of Rochester, and Northwest Executives Brokerage Inc.

Sten-Erik Hoidal, Ted C. Koshiol, and Todd A. Wind, **FREDRIKSON & BYRON, PA**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425, for defendants Compark, LLC, Compark 6-2, LLC, Lowell Penz, Bryan Schoeppner, John Wade, Edward Lunn, Darren Groteboer,

Alan Schafer, Joel Alberts, Joel S. Larson, Jeffrey L. Bigler, Kenneth Nash, M&L Partnership, TJ Haley, LLC, 4 TP, LLC, Jadco Properties, Jadco Properties, LLC, and SLB Services, LLC.

Plaintiffs Jean Francois Damon and Jacqueline Damon's (the "Damons") claims arise out of a commercial real estate purchase in 2005. The Damons' complaint includes fifteen counts, including breach of fiduciary duties and fraud, against their real estate agents (Daniel Groteboer, Merl Groteboer, RE/MAX of Rochester, Northwest Executives Brokerage Inc. (collectively, the "Realtor Defendants")) and the sellers of the real estate (Compark, LLC, Compark 6-2, LLC, and the fourteen members of Compark, LLC (collectively, the "Compark Defendants")). The matter is currently before the Court on the Realtor Defendants' motion to dismiss for lack of subject matter jurisdiction, the Realtor Defendants' motion for partial summary judgment, the Compark Defendants' motion for summary judgment, and various objections to rulings of United States Magistrate Judge Franklin L. Noel relating to the subject matter jurisdiction issue. For the reasons explained below, the Court will deny the Realtor Defendants' motion to dismiss and will grant in part and deny in part defendants' motions for summary judgment.

## BACKGROUND

## I.    COMPARK AND THE DEVELOPMENT

This action involves commercial real estate in the "Commerce Park" development in northwest Rochester, Minnesota. Dan Penz's company 4TP, LLC possessed the right to purchase several lots in Commerce Park. (Third Aff. of Sten-Erik Hoidal, Ex. 3 at 9,

Aug. 9, 2012, Docket Nos. 152-53.)  Penz's discussions with Merl Groteboer led to the formation of Compark, LLC on December 29, 2004.  (Third Hoidal Aff., Ex. 4 (Dep. of Daniel L. Penz ("Penz Dep.")) 27-28; Third Hoidal Aff., Ex. 5.)  The lots in Commerce Park were estimated to be worth between $7.4 and $8 million, and 4TP LLC obtained a 47.5% membership interest in Compark by transferring to Compark its right to purchase the lots.  (Penz Dep. 28-29, 32-33.)  The remaining 52.5% interest in Compark was held by a group of investors that contributed approximately $3 million  and obtained a loan for $1.1 million to purchase the lots.  (Third Hoidal Aff., Exs. 8-9.)  Compark used these funds to purchase the lots for $3.7 million.

Merl Groteboer ("Merl G.") is Compark's Chief Manager and Ed Lunn is its Chief Financial Officer and Secretary.  (Seventh Aff. of Steven J. Weintraut, Ex. 52 (Dep. of Merl Groteboer ("Merl G. Dep.")) 41:25-42:13, Sept. 14, 2012, Docket No. 168.)  Merl's son, Dan Groteboer ("Dan G."), is also a member of Compark.  (Seventh Weintraut Aff., Ex. 48 (Dep. of Daniel Groteboer ("Dan G. Dep.")) 48:24-49:18.)     Merl G. and Dan G. are real estate agents for RE/MAX of Rochester.  (Third Hoidal Aff., Ex. 7 at 20.)  Penz was an indirect member of Compark through 4TP, LLC.  (Penz Dep. 77:21-25.)  The rest of Compark's membership consists of business people and investors and to the extent that they are relevant to the present action, the Court will discuss them below.

## II.    THE DAMONS' PURCHASE

The events leading up to the present action begin with the Damons' July 2005 sale of a rental home in Maryland that netted approximately $630,000.  (Third Hoidal Aff.,

Ex. 11 (Dep. of Jean Francois Damon ("Mr. Damon Dep.")) 18:21-19:19.)  The Damons then decided to invest those proceeds in a "like-kind" property in order to avoid paying taxes on the proceeds – a process known as a § 1031 exchange.  (*Id.* 19:23-20:8.)  The Damons invested about $200,000 in oil and gas royalties and, on the advice of family members, decided to invest the remaining money in commercial real estate in Rochester, Minnesota.  (Fourth Aff. of Christopher P. Renz, Ex. A (Dep. of Jacqueline Ruth Damon ("Ms. Damon Dep.")) 30:10-13, 40:5-12, 344:14-21, Aug. 9, 2012, Docket No. 143.)  There was a deadline of September 10, 2005, for the Damons to identify properties for the § 1031 exchange.

On September 2, 2005, the Damons met with Dan G. and took a tour of Rochester to look at developing areas.  (Mr. Damon Dep. 39:12-25.)  The Damons and Dan G. dispute how much detail the Damons provided regarding the amount they wanted to spend on property during this meeting, but the meeting ended without the Damons selecting a property or signing an agreement with Dan G.  (*Id.* 41:5-11.)

On September 7, 2005, the Damons met with Dan G. again, visited Commerce Park, and discussed the possibility of purchasing a building within the development that contained four office condos and was for sale for $1.21 million.  (*Id.* 232-33.)  Dan G. informed the Damons that Commerce Park was owned by Compark, that Compark was owned by fourteen investors including himself, and that separate LLCs held each building in Commerce Park.  (Ms. Damon Dep. 389:20-390:19.)  The Damons allege that Dan G. agreed to serve as their leasing agent, through RE/MAX, and find tenants for the

building, but the alleged agreement was not reduced to writing and its specifics were not discussed.  (*Id.* 189-90, 403-04.)  Dan G. denies making such an agreement.

During the September 7 meeting, Dan G. presented a "Financial Analysis" to the Damons, which had been prepared by Merl G., and was intended to justify the $1.2 million asking price.  (*See* Seventh Weintraut Aff., Ex. 71.)  The Damons allege that the Financial Analysis contained several false or misleading aspects, such as being based on a 100% occupancy rate, asserting that the condos were viable rental properties when they are typically sold, assuming rent of $13.50 per square foot even though such a figure was based on a fully finished interior and the building was being sold as a "vanilla shell," and asserting that the units were 1,802 square feet each when in fact they were under 1,600.

At the close of the meeting, the Damons signed an agreement to purchase the building for $1.21 million.  (Ms. Damon Dep. 369.)  The Purchase Agreement included a $96,800 one-year rent guarantee from the sellers.  (*Id.* 214.)  The Agreement indicated that the Groteboers were representing the Damons and Dan G. told the Damons that he was also representing the seller, Compark.  (*See* Fourth Renz Aff., Ex. N.)  At some point after the meeting, Dan G. made a notation on the Financial Analysis that appears to indicate that he knew the square footage he conveyed to the Damons was incorrect and that rent of $14.90 per square foot, not $13.50, was needed to achieve the desired income. (Seventh Weintraut Aff., Ex. 71; Dan G. Dep. 104:14-23.)

The Damons allege that Dan G. made several misrepresentations during the September 7 meeting, such as that there were no buildings available that would better suit

the Damons' needs, that the Groteboers would represent the Damons in leasing the building, that there were numerous strong leads for tenants including a tenant associated with Mayo Clinic, that there was "no doubt" they could fill the building with tenants in one year, and that the size of the units was 1,802 square feet.  (Third Am. Compl. ¶ 81, July 10, 2012, Docket No. 126.)[1]

The Purchase Agreement included an "acceptance deadline" stating that the offer to purchase would be "null and void" if it was not accepted by September 8, 2005. (Fourth Renz Aff., Ex. N at 2.)  Dan G. testified that sometime after the Damons signed the Agreement on September 7, there was a meeting of the Compark members and Lunn signed for Compark.  (Dan G. Dep. 112-13, 281-82.)  The first record of the signed Agreement appeared on October 10, 2005, when Dan G. faxed the signed agreement to Dan Berndt, Compark's attorney.  (Seventh Weintraut Aff., Exs. 77-79.)

The Purchase Agreement also indicated that Dan G. and Merl G. were the agents for both the Damons (the buyers) and Compark (the sellers).  (Fourth Renz Aff., Ex. N.)

## III.    COMPARK 6-2

In connection with developing various commercial buildings on its lots, Compark created three LLCs for which it was the sole member: Compark 6-2, Compark 3-1, and Compark 1-1.  (Third Hoidal Aff., Ex. 7 at 13-14.)  Compark maintains a bank account

---

[1] Prior to closing, the Damons received documents relating to the building that contained the accurate dimensions, but the Damons allege that the documents were illegible.  (Ms. Damon Dep. 378:5-16; Seventh Weintraut Aff., Ex. 131.)

and files taxes, but the additional LLCs do not.  The purpose of creating separate LLCs was to facilitate obtaining separate financing for each parcel and avoid complications that might arise if several properties financed by a single loan were sold individually.  (*Id.*, Ex. 7 at 13-15.)

According to the Purchase Agreement, Compark was the seller to the Damons. (Fourth Renz Aff., Ex. N.)  On October 12, 2005, however, Compark transferred the land to Compark 6-2 via quit claim deed.  (Third Hoidal Aff., Ex. 26.)  The Damons did not learn about this transfer and the Damons' representative at closing did not notice that Compark 6-2, not Compark, was listed as the seller.

## IV.    FINANCING AND CLOSING

Dan G. agreed to help the Damons obtain financing.  (Ms. Damon Dep. 201; Dan G. Dep. 140.)  On September 14, 2005, Dan G. told the Damons that Associated Bank offered a 6.5% interest rate that would only stay in place for sixty days, meaning the Damons needed to close on the building in November 2005, rather than January 2006 as set forth in the purchase agreement.  (Ms. Damon Dep. 202, 209-10; Third Hoidal Aff., Ex. 20.)  Ms. Damon learned prior to closing that Associated Bank would actually hold the 6.5% interest rate for longer than sixty days, but the Damons still agreed to close in November 2005.  (Ms. Damon Dep. 205-06, 361-62; Third Hoidal Aff., Ex. 20.)  The Damons allege that they had already arranged for the earlier closing date with Ms. Damon's sister and proceeded with the November closing for that reason.

Associated Bank arranged for Title Services, Inc. ("Title Services") to serve as the settlement agent at the closing.  (Third Hoidal Aff., Ex. 2 (Dep. of Daniel E. Berndt ("Berndt Dep.")) 34:12-14.)  Title Services is a wholly owned subsidiary of Dan Berndt's law firm.  Title Services distributed closing documents to the buyer and seller that reflected that Compark 6-2 was the seller, not Compark.  (Ms. Damon Dep., 159-60, 217, 430-31; Third Hoidal Aff., Ex. 25.)  The Damons did not attend the closing on November 18, 2005, but the Damons were represented at the closing by Ms. Damon's sister, Judy O'Donohoe.  (Ms. Damon Dep. 89:21-24.)

Portions of the proceeds from the sale were used to pay down Compark's loan from Associated Bank and to reduce the personal guarantees of Compark members, and $96,780 was held for Compark 6-2 to satisfy its one year rent guarantee to the Damons. Merl G. and Dan G. each received a commission of $24,000 for representing the Damons and Compark at the closing.   (Third Hoidal Aff., Ex. 36; Dan G. Dep. 162-65.) Compark's net proceeds were $743,261.59.  (Third Hoidal Aff., Ex. 36.)

The day before closing, Dan G. sent Ms. Damon an email informing her that Steve Seymour would be helping to rent the condos, and telling her that "Merl [G.] and I also have large for rent signs out there" and "Merl [G.] Steve and I have been . . . showing the units."  (Third Hoidal Aff., Ex. 33.)  The signs actually said "Office Condos for Sale or Lease."  (Seventh Weintraut Aff., Ex. 90.)

## V.     THE APPRAISAL

Prior to the closing, Associated Bank had the building appraised, informed the Damons that its value was determined to be $1,257,000 in finished condition, and offered to make the appraisal available to the Damons.   (Third Hoidal Aff., Ex. 22.)   The appraisal was performed by Scott Renne.   In April 2009, the Damons learned that Renne had faced criminal charges for an alleged scheme involving fraudulent appraisals and kickbacks and committed suicide in May 2007.   Based on other sales Compark made in the Commerce Park, the Damons' expert opines that the value of the Damons' building on the date of closing was actually $950,000.  (Seventh Weintraut Aff., Ex. 129 at 2.)

## VI.     EFFORTS TO LEASE THE PROPERTY

The Damons allege that they were expecting the Groteboers to work to lease the building after the closing and that they were expecting to pay the Groteboers a commission to do that work, even though such a commission had not been discussed. (Ms. Damon Dep. 229-230.)  During the first half of 2006, Ms. Damon and Dan G. spoke on a number of occasions and Dan G. repeatedly informed Ms. Damon that there were numerous calls and showings.   However, Steve Seymour later told the Damons that he would not represent them in leasing the properties.  (Ms. Damon Dep. 273.)

The Damons came to Rochester in October 2006 to meet with Dan G.   On December 15, 2006, after the rent guarantee expired, Dan G. emailed the Damons and told them "Unfortunately the Rochester rental market got very soft over the last 8 months . . .  I have shown these units . . . 100 times at least but have not been able to get the

people to carry thru . . . ."  (Seventh Weintraut Aff., Ex. 134.)  Dan G. now testifies that

he remembers showing the properties to only two potential tenants – a day care center

and a fitness center.  (Dan G. Dep. 284-86.)  On January 5, 2007, Merl G. sent a letter of

intent to a client indicating that the client would be entering into a seven year lease for

approximately 1,300 square feet of space, but this opportunity was never presented to

Damons.  (Seventh Weintraut Aff., Ex. 98.)

## VII.   THE DAMONS' LATER ACTIONS

The Damons hired Paramark to be the leasing agent for their property in February

2007.  In July 2008, Ms. Damon attempted to meet with the Groteboers but Dan G. told

her to leave or he would call the police.  (Ms. Damon Dep. 139-140.)  Around August

2008, the Damons formed Damon Center, LLC ("Damon Center") and transferred

ownership of the building to Damon Center in order to limit the Damons' personal

liability in relation to leasing units in the building.  (Ms. Damon Dep., 250-51.)  The

building was not fully leased until 2010, when Damon Center entered into multi-year

leases for all units in the building.  (*Id.* 488-89, 492.)  The Damons, through Damon

Center, paid approximately $192,000 for build-outs for tenants in order to lease the units.

The Damons filed the present action on January 11, 2010.  (Compl., Jan. 11, 2010,

Docket No. 1.)

## ANALYSIS

## I.   MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

As a threshold matter, the Court must consider whether the action must be dismissed on the basis that Ms. Damon is a United States citizen but has no United States domicile and is therefore "stateless," which destroys diversity jurisdiction. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828-29 (1989).[2]  Although defendants did not raise this issue until over two years after the commencement of the litigation, objections to subject matter jurisdiction are never waived and the Court is obligated to determine whether it has jurisdiction.  *See Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012).  For the reasons explained below, the Court will find that Ms. Damon does not have a United States domicile, but that she is not an indispensable party and can be dismissed from the action in order to preserve the Court's jurisdiction.

### A.   Standard of Review

A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject matter jurisdiction and requires the Court to examine whether it has authority to decide the claims.  *Molina Jerez v. Holder*, Civ. No. 10-4498, 2012 WL 1072581, at *3 (D. Minn. Mar. 30, 2012).  "A court deciding a motion under Rule 12(b)(1) must

---

[2] The Realtor Defendants move to dismiss on these grounds and the Compark Defendants raise the same argument in their motion for summary judgment.

distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918

F.2d 724, 734 n.6 (8th Cir. 1990).  In deciding a facial attack,

> the court restricts itself to the face of the pleadings, and the non-moving
> party receives the same protections as it would defending against a motion
> brought under Rule 12(b)(6).  The general rule is that a complaint should
> not be dismissed unless it appears beyond doubt that the plaintiff can prove
> no set of facts in support of his claim which would entitle him to relief.  In
> a factual attack, the court considers matters outside the pleadings, and the
> non-moving party does not have the benefit of 12(b)(6) safeguards.

*Id.* (citations and internal quotation marks omitted).

## B.      Facts Relevant to Subject Matter Jurisdiction

The complaint states that "Jacqueline Damon is a U.S. citizen, and her last place

of residence in the United States was Maryland" and that "Damons currently reside in

Nairobi, Kenya." (Third Am. Compl. ¶ 1.)  Ms. Damon filed affidavits providing greater

detail in an attempt to establish that she has a United States domicile.[3]  Ms. Damon has

lived in Kenya since January 2008, when she moved to join Mr. Damon in operating an

ecotourism business.   (Aff. of Jacqueline Damon ¶¶ 12-13, Oct. 15, 2012, Docket

No. 178.)  Ms. Damon has not lived in Maryland since 1991.[4]  (*Id.* ¶ 5.)  Ms. Damon did,

however, own a home in Maryland and pay taxes in Maryland until 2005.  (*Id.* ¶¶ 4, 9.)

---

[3] Here, the Realtor Defendants contend their attack is facial, which would prevent the Court from considering affidavits submitted by Ms. Damon.  However, because the Court finds that the outcome would be the same whether or not it considers Ms. Damon's affidavits, it will include the contents of the affidavits in its analysis.

[4] Ms. Damon lived in Burundi from 1991 to 1995, France from 1995 to 2006, and Rwanda from 2007 to 2008.  (Damon Aff. ¶¶ 7-8, 10-11.)

Ms. Damon also avers that she maintains a bank account in Washington, DC and continues to vote in Maryland.  (*Id.* ¶ 5.)

In September 2009, Ms. Damon was diagnosed with cancer and decided to obtain treatment in Virginia.  (*Id.* ¶ 17.)  From 2009 to the present, she has spent most of her time in Virginia, briefly renting a home but primarily living with friends.  (*Id.* ¶¶ 17, 19.) Ms. Damon has also returned to Kenya on several occasions during this period, and she avers that her "plan was to stay in Virginia as long as necessary to get better."  (*Id.* ¶¶ 17-20, 23.)   Ms. Damon avers that the Damons "intend to return to the U.S. (possibly Maryland) or France" when the venture in Kenya is completed.  (Supplemental Aff. of Jacqueline Damon ¶ 4, Oct. 15, 2012, Docket No. 179.)

### C.    Ms. Damon's Domicile

The Court's purported jurisdiction over the Damons' state law claims is provided by 28 U.S.C. § 1332, the diversity jurisdiction statute, which provides:

(a)   The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

   (1)   citizens of different States;

   (2)   citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

   (3)   citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

   (4)   a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

"In order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States **and** be domiciled within the State." *Newman-Green*, 490 U.S. at 828 (emphasis in original). A United States citizen who has no domicile in a state is "stateless" and destroys diversity jurisdiction. *See id.* at 829 ("[Defendant]'s 'stateless' status destroyed complete diversity under § 1332(a)(3), and his United States citizenship destroyed complete diversity under § 1332(a)(2)."). Thus, if Ms. Damon, who is a United States citizen, does not have a United States domicile, she will destroy the Court's subject matter jurisdiction.

There are two requirements to establish a domicile: (1) "physical presence in a state"; and (2) "intent to remain there indefinitely." *Altimore v. Mount Mercy Coll.*, 420 F.3d 763, 768 (8th Cir. 2005); *Yeldell v. Tutt*, 913 F.2d 533, 537 (8th Cir. 1990). Domicile is determined at the time the action is instituted. *Yeldell*, 913 F.2d at 537. The Damons' arguments regarding Ms. Damon's potential domiciles in the United States have shifted as the parties litigated this matter before the Magistrate Judge in the context of motions to amend pleadings. None are persuasive.

First, in response to Realtor Defendants' motion to dismiss, the Damons argued that Ms. Damon's domicile was Virginia as of January 11, 2010, the date the complaint was filed. (*See* Pl.'s Mem. in Opp. at 2, Sept. 14, 2012, Docket No. 165.) United States Magistrate Judge Franklin L. Noel considered and rejected this argument in an order denying as futile the Damons' motion to amend their complaint to add additional factual allegations relating to Ms. Damon's domicile. (*See* Order at 2-3, Nov. 7, 2012, Docket

No. 197.)   The Court finds, as the Magistrate Judge found, that Ms. Damon was not domiciled in Virginia as of January 11, 2010, because she intended to remain in Virginia only until she recovered from her illness, not indefinitely. *See Yeldell*, 913 F.2d at 537.

Second, in their appeal from the Magistrate Judge's order, the Damons argue that defendants have the burden of demonstrating that Ms. Damon changed her domicile from Maryland and have failed to meet the burden. (*See* Pl.'s Rule 72(a) Objections at 2, Nov. 21, 2012, Docket No. 205.)   In *Maple Island Farm v. Bitterling*, the Eighth Circuit held that "[t]here are rebuttable presumptions [1] that the place where a person actually lives is his domicile and [2] that a domicile, once established, continues until a change is shown, so that the burden of proving a change of domicile rests on the party alleging it." 196 F.2d 55, 58 (8th Cir. 1952).   *Maple Island* also held that "[t]he presumption is in favor of an original or former domicile as against an acquired one, and of a domestic as against a foreign one," and that "[p]roof of a change of domicile must be clear and convincing." *Id.* at 58-59 (internal quotation marks omitted).   The Damons focus on the second "rebuttable presumption" set forth in *Maple Island* and insist that Ms. Damon's domicile was established in Maryland as of 1991 and the burden is on defendants to prove that Kenya is now her domicile.

The Court finds, however, that placing the burden on defendants is inappropriate in this context.   For one, it runs counter to the general rule that the party asserting jurisdiction bears the burden of proving by a preponderance of the evidence that diversity jurisdiction exists. *Clark v. Matthews Int'l Corp.*, 639 F.3d 391, 396 (8th Cir. 2011); *see also St. Onge v. McNeilus Truck & Mfg., Inc.*, 645 F. Supp. 280, 282 (D. Minn. 1986)

("The party asserting jurisdiction . . . has the burden of persuasion throughout to establish by a preponderance of evidence that the claimed diverse domicile has not been changed."). Additionally, the first "rebuttable presumption" set forth in *Maple Island*, (that the place where a person actually lives is his domicile), would apply in favor of finding that Ms. Damon's domicile at the time of filing was Kenya, or possibly Virginia, but not Maryland. Finally, placing a steep burden on defendants to establish by clear and convincing evidence that Ms. Damon's once-established domicile in Maryland has changed is inconsistent with the Supreme Court's instruction that "[t]he policy of the [diversity jurisdiction] statute calls for its strict construction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 377 (1978) (internal quotation marks omitted). Thus, the Court finds that the burden is on the Damons to prove that Ms. Damon possesses a United States domicile and that the action satisfies the requirements of diversity jurisdiction. *Clark*, 639 F.3d at 396.

Again, the two requirements to establish a domicile are (1) physical presence in a state; and (2) intent to remain there indefinitely. *Altimore*, 420 F.3d at 768. While Ms. Damon did, at one point, satisfy the first requirement by living in Maryland, the Court finds that the Damons have failed to establish that Ms. Damon intends to remain in Maryland indefinitely. Even if the Court considers Ms. Damon's averment that she and Mr. Damon "intend to return to the U.S. (possibly Maryland) or France" when their business venture in Kenya is completed, her uncertain and noncommittal statement does not amount to proof that she intends to live indefinitely in Maryland. *See Gilbert v. David*, 235 U.S. 561, 570 (1915) (holding that plaintiff's "floating intention of returning

to Michigan after the determination of certain litigation and the disposition of his property in Connecticut" was insufficient to maintain a domicile in Michigan).

Because the Court finds that Ms. Damon does not have a United States domicile, it will overrule the Damons' objections to the Magistrate Judge's November 7, 2012 order denying the Damons' motion to amend their complaint and affirm the order. The Court's finding also renders moot the Damons' and the Realtor Defendants' objections to the Magistrate Judge's November 16, 2012 order regarding the status of Ms. Damon's affidavits. (*See* Pl.'s Rule 72(a) Objection to the Court's November 16, 2012, Order, Nov. 30, 2012, Docket No. 206; Objection to Order of Magistrate Judge, Nov. 30, 2012, Docket No. 207.) However, the Court's finding is not dispositive of the Realtor Defendants' motion to dismiss because the Court must turn to the issue of whether Ms. Damon is an indispensable party.

### D.   Ms. Damon's Dispensability

Having determined that Ms. Damon is "stateless" and destroys diversity jurisdiction, the Court must next determine whether it must dismiss the action entirely or if it can simply dismiss Ms. Damon pursuant to Rule 21 to repair jurisdiction. *See* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."). This question turns on Rule 19 of the Federal Rules of Civil Procedure, which defines when a party is "indispensable." *See Newman-Green*, 490 U.S. at 832 ("[I]t is well settled that Rule 21 invests district courts with authority to allow a **dispensable** nondiverse party to be dropped at any time[.]" (emphasis added)).

Rule 19(a) explains who qualifies as a "person[] required to be joined if feasible." The Court finds that Ms. Damon falls within this group because, as a party to the challenged real estate transaction, she has an interest relating to the subject matter and "disposing of the action in [her] absence may . . . impair or impede [her] ability to protect the interest." *See* Fed. R. Civ. P. 19(a)(1)(B).[5]  When a person required to be joined if feasible deprives the court of subject matter jurisdiction, Rule 19(b) instructs the Court to consider the following four factors to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed":

(1)   the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2)   the extent to which any prejudice could be lessened or avoided by:

   (A) protective provisions in the judgment;

   (B) shaping the relief; or

   (C) other measures;

(3)   whether a judgment rendered in the person's absence would be adequate; and

(4)   whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*See* Fed. R. Civ. P. 19(b).

Here, the Damons urge the Court to simply dismiss Ms. Damon, rather than dismiss the entire action.  On the other hand, defendants contend that they will suffer

---

[5] *See also In re United States ex rel. Hall*, 825 F. Supp. 1422, 1429 (D. Minn. 1993) ("[T]he absent tribes are parties to the challenged contracts and transactions.  The goods and services provided pursuant to the agreements are essential to the operation of the commercial casinos owned by the tribes.  A judgment avoiding those transactions certainly would be prejudicial to the interests of the casinos and their owners, the tribes."), *aff'd sub nom. United States ex rel. Hall v. Creative Games Tech., Inc.*, 27 F.3d 572 (8th Cir. 1994).

prejudice if Ms. Damon is dismissed because there will be a risk that she will attempt to simultaneously prosecute the same action against defendants in state court or that she will later attempt to bring the same claims in state or federal court and not be precluded from doing so because she was not a party to the present action.

The Court finds that there is no risk of prejudice if the action continues in Ms. Damon's absence.  As for potential prejudice to Ms. Damon, the Damons assure the Court that her interests are perfectly aligned with Mr. Damon's and that they are comfortable with the action proceeding without her.  The Court is permitted to accept the Damons' position and allow the action to proceed without Ms. Damon.  *See In re Allustiarte*, 786 F.2d 910, 919 (9th Cir. 1986) ("Joinder is not required where the absent parties' interests are adequately protected by those who are present.  The record demonstrates that the interests of the absent spouses were adequately protected by the Allustiartes who were present at trial." (citations omitted)).

As for potential prejudice to defendants, if Ms. Damon ever attempted to revive these claims in state or federal court on the basis that her interests were not adequately protected in the present action, the court could quickly determine that she was estopped from making the argument because she has persuaded this Court to accept the opposite argument.  *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006) ("[A] party that takes a certain position in a legal proceeding, and succeeds in maintaining that position, is prohibited from thereafter assuming a contrary position simply because his interests have changed." (internal quotation marks omitted)).

Further, a later court in which Ms. Damon attempted to bring these claims would likely find that Ms. Damon is precluded from re-litigating her husband's claims based on privity. "[W]hen determining whether privity exists, the proper focus is on whether the legal rights of the party to be estopped were adequately represented by the party to the first litigation." *State v. Lemmer*, 736 N.W.2d 650, 661 (Minn. 2007).[6] Here, where the Damons have assured the Court that Ms. Damon's interests will be adequately represented in her absence by Mr. Damon, it would seem to follow that she is in privity with Mr. Damon and is precluded from re-litigating his claims.[7]

---

[6] *See also Clark v. Yellow Med. Cnty. Bd. of Comm'rs*, No. A06-194, 2006 WL 2406215, at *3 (Minn. Ct. App. Aug. 22, 2006) ("Those in privity would include (a) those who control an action although not parties to it, (b) **those whose interests are represented by a party to the action**, and (c) successors in interest to those having derivative claims.  The circumstances of each case must be examined to determine the nature and extent of the relationship between a formal party and the person alleged to have been in privity with that party." (emphasis added) (citations and internal quotation marks omitted)); *Tokheim v. Pollard*, No. C1-00-1937, 2001 WL 1035020, at *4 (Minn. Ct. App. Sept. 11, 2001) ("[R]es judicata and collateral estoppel require identical parties or parties in privity.  Privity does not follow one specific definition but rather expresses the idea that, in some situations, a judgment should determine the interests of certain non-parties closely connected with the litigation.  Privity requires that the estopped party's interests have been sufficiently represented in the first action so that the application of collateral estoppel is not inequitable." (citations omitted)).

[7] To lessen the risk of prejudice further, the Court will dismiss Ms. Damon from the action with prejudice.  The Realtor Defendants contend that the Court lacks authority to dismiss Ms. Damon with prejudice because "[u]nder Rule 41(b) of the Federal Rules of Civil Procedure, dismissal for lack of jurisdiction is not an adjudication on the merits and thus such a dismissal should be without prejudice."  *Ahmed v. United States*, 147 F.3d 791, 797 (8th Cir. 1998).  However, Rule 41(b) addresses the involuntary dismissal of actions, whereas in this instance, the Court is dismissing a party pursuant to Rule 21, and the Court is doing so at the party's request.  As such, the Court finds that it may dismiss Ms. Damon with prejudice and that dropping her from the action with prejudice amounts to "just terms."  Fed. R. Civ. P. 21; *see also Newman-Green*, 490 U.S. at 838 (approving of a lower court's decision to dismiss a party with prejudice pursuant to Rule 21).

- 20 -

As for the remaining factors, the Court finds that a judgment rendered in Ms. Damon's absence would be adequate because Mr. Damon's claims are identical to Ms. Damon's and because defendants have no claims against Ms. Damon.[8]  The Court also finds that although the Damons could pursue their claim in state court, judicial economy favors this Court resolving the merits of the dispute because multiple rounds of dispositive motions have already taken place and the action is now ready for trial.  For those reasons, and primarily because neither Ms. Damon nor defendants will suffer prejudice, the Court finds that it is equitable and appropriate for the action to proceed in Ms. Damon's absence.  Thus, Ms. Damon will be dismissed from the action with prejudice and the Realtor Defendants' motion to dismiss the action will be denied.

## II.  MOTIONS FOR SUMMARY JUDGMENT

The Court will now turn to the Realtor Defendants' motion for partial summary judgment and the Compark Defendants' motion for summary judgment.  Because there is substantial overlap between the two motions, the Court will discuss them simultaneously, distinguishing between the two where necessary.

---

[8] The Realtor Defendants contend that judgment in Ms. Damon's absence would not be adequate because the Damons seek rescission, which defendants claim the Court cannot order if one of the parties to the contract has been dismissed.  The Court need not determine whether it would have the authority to order rescission in Ms. Damon's absence, or whether its potential inability to order rescission would render its judgment inadequate, because the Court will find below that the Damons are not entitled to rescind the agreement.

## A.     Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## B.     Agency

As a preliminary matter, the Court must determine whether the Compark Defendants are potentially liable for the alleged misrepresentations of Dan G. and Merl G.  The answer hinges on whether Dan G. and Merl G. acted as agents of Compark and whether they acted within the scope of their actual or apparent authority.  *See Semrad v. Edina Realty, Inc.*, 493 N.W.2d 528, 535 (Minn. 1992) ("Generally speaking, a principal is liable for the act of an agent committed in the course and within the scope of the agency and not for a purpose personal to the agent.").

Under Minnesota law, "the existence of an agency relationship is a question of fact" and it "may be proved by circumstantial evidence of a course of dealing between the two parties."  *Vacura v. Haar's Equip., Inc.*, 364 N.W.2d 387, 391 (Minn. 1985).

Here, the Purchase Agreement explicitly states that Dan G. and Merl G. are the agents for Compark, the seller.[9]   Further, when a real estate agent makes misrepresentations that induce a sale, and the seller retains the benefits of the sale, the seller is bound by the agent's misrepresentations.   *See Swanson v. Domning*, 86 N.W.2d 716, 721-22 (Minn. 1957).[10]   For these reasons, the Court finds that the Damons have at least established that a reasonable factfinder could find that Dan G. and Merl G. were Compark's agents and that the Compark Defendants are potentially liable for certain representations made by the Realtor Defendants, which the Court will discuss in more detail below.

---

[9] The elements of an agency relationship are: (1) "the manifestation by the principal that the agent shall act for him"; and (2) "the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking."   *PMH Props. v. Nichols*, 263 N.W.2d 799, 803 (Minn. 1978) (quoting Restatement (Second) of Agency § 1, cmt. B (1958)).   It might be reasonable for a jury to find that these elements are satisfied simply on the basis of the Purchase Agreement, though other evidence of the defendants' relationship and interactions also tends to support a finding of agency.

[10] The *Swanson* court held that :

> When a principal retains the benefits of a contract obtained for him by his agent, he cannot repudiate the acts of the agent which induced the other party to the contract to enter into it on the ground that such acts were unauthorized.   By accepting the contract he takes with it whatever taint attached to its origin, and by retaining the fruits of the unauthorized acts he assumes the same responsibility therefor as though they had been done with his authority.   One who accepts a sale of property negotiated through the medium of another is bound by the representations made to accomplish the sale.

86 N.W.2d at 721-22 (internal quotation marks omitted).

## C.    Consumer Fraud

Defendants move for summary judgment on the Damons' consumer fraud claim on the basis that the Damons' claim is not brought for the public benefit.  Minnesota Statutes § 325F.69, the Consumer Fraud Act, provides that any fraud is enjoinable. Minn. Stat. § 325F.69, subd. 1.  Minnesota Statutes § 8.31, subd. 3a, the private attorney general statute, allows plaintiffs to seek damages for violations of the Consumer Fraud Act, but the plaintiff must demonstrate that its claim is brought for the public benefit. *See Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000).  A "single one-on-one transaction in which the fraudulent misrepresentation . . . was made only to [one party] . . . is not a claim that could be considered to be within the duties and responsibilities of the attorney general to investigate and enjoin." *Id.*[11]

Here, the Court finds that the Damons' claims arise from a "single one-on-one transaction." *Id.*; *see also Kivel v. WealthSpring Mortg. Corp.*, 398 F. Supp. 2d 1049, 1056 (D. Minn. 2005) ("The public benefit requirement is typically not met where the alleged conduct occurs in an individualized setting[.]").  The Damons have presented no evidence that Dan G. made the alleged misrepresentations to anyone other than them.

---

[11] Minnesota Statutes § 8.31, subd. 3a, is not expressly limited to actions for the public benefit, but the *Ly* court read such a limitation into the statute.  The court held that the private attorney general statute could not apply to a broader range of claims than the true attorney general had a duty to investigate. *See Ly*, 615 N.W.2d at 313.  The court also reasoned that "the legislature could not have intended to sweep every private dispute based on fraud, and falling within the [Consumer Fraud Act], into a statute where attorney fees and additional costs and expenses would be awarded, because to do so would substantially alter a fundamental principle of law deeply ingrained in our common law jurisprudence – that each party bears his own attorney fees in the absence of a statutory or contractual exception." *Id.* at 314.

Although the Damons claim they are seeking injunctive relief to prevent similar harms in the future, Compark's potential future sales of other lots to people other than the Damons are not a proper subject for injunctive relief in this dispute.   Additionally, "merely seeking injunctive relief" that might "caus[e] defendant to be more forthright in the future as a result of injunctive relief does not satisfy [the] public benefit requirement.   *Kivel*, 398 F. Supp. 2d at 1056.   Thus, the Court will grant defendants' motions for summary judgment on the Damons' consumer fraud claim.

### D.      Deceptive Trade Practices

Defendants move for summary judgment on the Damons' deceptive trade practices claim, which is brought pursuant to Minn. Stat. § 325D.44, subd. 1(2) & (13),[12] on the basis that the Deceptive Trade Practices Act ("DTPA") does not apply to real estate transactions and allows only injunctive relief.   The Eighth Circuit has expressed doubt that the DTPA applies to real estate transactions, due to its emphasis on "goods and services."   *See Kellogg Square P'ship v. Prudential Ins. Co. of Am.*, 63 F.3d 699, 703 n.8

---

[12] In relevant part, Minn. Stat. § 325D.44, subd. 1, provides:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

. . .

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

. . .

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(8th Cir. 1995) ("We doubt that the [DTPA] even applies to this real estate purchase transaction. Two of the three sections relied upon by [plaintiff] refer to misrepresentations relating to 'goods or services.'"). Additionally, under Minnesota law, "the sole statutory remedy for deceptive trade practices is injunctive relief." *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999) (internal quotation marks omitted). The DTPA "provides relief from future damage, not past damage." *Gardner v. First Am. Title Ins. Co.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003).

Here, although the Damons contend they seek relief from future damage because defendants have additional properties to sell and might make similar misrepresentations to future buyers, the Court finds that the Damons do not have a valid claim for injunctive relief because they have not presented evidence that they face any risk of future harm to themselves. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing . . . is . . . injury to the plaintiff."); *see also Gardner*, 296 F. Supp. 2d at 1021 ("Plaintiffs must advance record evidence sufficient to support an inference of future harm **to Plaintiffs**." (emphasis added)). Because the Damons have not presented evidence supporting a valid claim for injunctive relief and injunctive relief is the only remedy under the DTPA, the Court will grant defendants' motion for summary judgment on the DTPA claim.[13]

---

[13] Additionally, as the Eighth Circuit noted in *Kellogg Square*, it is somewhat doubtful that the real estate transaction at the heart of the present action falls within the intended scope of the DTPA, but the Court need not definitively decide this issue.

### E.     Common Law Fraud[14]

Under Minnesota law, the elements of fraud are: "(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance." *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986). The Damons allege that several representations amount to fraud and the Court will address the allegations in turn. For the reasons below, and with the limitations explained below, the Court will deny defendants' motion for summary judgment on the Damons' fraud claim.

The first allegedly fraudulent representation is Dan G.'s statement that there were no other commercial buildings available for sale in the Rochester area that better met the Damons' needs. The Court finds that this is a statement of opinion that cannot form the basis of a fraud claim. *See, e.g.*, *Mutsch v. Rigi*, 430 N.W.2d 201, 204 (Minn. Ct. App. 1988) ("[E]xpressions of mere opinion or conjecture are not actionable.").[15]

---

[14] In its discussion, the Court will focus solely on the elements that defendants challenge. The Damons will, of course, need to establish each and every element of fraud at trial.

[15] *See also Am. Computer Trust Leasing v. Jack Farrell Implement Co.*, 763 F. Supp. 1473, 1487 (D. Minn. 1991) ("A wide variety of statements ordinarily used in sales negotiations are not actionable as fraud. These include ordinary sales puffing, statements of opinion, and promises of future performance. Moreover, any representation or expectation of future acts is not sufficient to support a fraud claim merely because the represented act or event does not

(Footnote continued on next page.)

The second allegedly fraudulent representation is Dan G.'s statement that the Groteboers, through RE/MAX, would market the condos for the whole development and would start with the Damons' building.   "[A] misrepresentation of a present intention could amount to fraud.   However, it must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made." *Vandeputte v. Soderholm*, 216 N.W.2d 144, 147 (Minn. 1974).   The Realtor Defendants assert there is no evidence Dan G. intended not to follow through with his statement when he made it. They further claim that this alleged misrepresentation could not have caused the Damons' damages because there is no evidence that the efforts would have succeeded had they been undertaken.   However, a reasonable jury could find by a preponderance of the evidence that Dan G. had no intention of starting with the Damons' property as he marketed the condos to potential buyers and lessees.   Several facts in the record support such an inference, including the evidence of the Groteboer's competing interest in selling the other units in Commerce Park, the arguably non-existent efforts Dan G. actually made to lease the Damons' units, and Dan G.'s e-mail suspiciously claiming he had shown the building at least one hundred times.   Further, a reasonable jury could find causation because the Damons allege that they would not have bought the building, or would have

_____

(Footnote continued.)

occur." (citations omitted)), *aff'd sub nom. Am. Computer Trust Leasing v. Boerboom Int'l, Inc.*, 967 F.2d 1208 (8th Cir. 1992).

paid less for the building, if they had known that Dan G. would not focus first on finding tenants for their units.

The third allegedly fraudulent representation is Dan G.'s statement that in September 2005, the Groteboers already had strong leads for tenants, including a tenant affiliated with Mayo clinic, and that multiple potential tenants had viewed the building. The parties dispute whether Dan G. stated that he had strong leads for tenants in the development generally, or for the Damons' potential units specifically.  Defendants argue that the representation was made concerning the entire development.   The Realtor Defendants note that Ms. Damon's testimony suggests that she believes Dan G. made the representation as to the development in general.   (Ms. Damon Dep. 118:6-10.)[16] However, on the basis of Dan G.'s testimony, a reasonable jury could find that Dan G. told the Damons that the strong lead from the Mayo tenant was for the building, not for the development generally.  (*See* Dan G. Dep. 227:6-21.)  Although the parties dispute the extent to which Dan G. overstated the level of interest in the Damons' building and the development generally, a reasonable jury could find that Dan G.'s representations went beyond mere puffery and constituted a false representation of fact.   Therefore the Court finds that summary judgment is not appropriate for this alleged misrepresentation.

The fourth allegedly fraudulent representation is Dan G.'s statement that there was "no doubt" that the Groteboers would lease all of the Damons' units within one year.

---

[16]  Dan G. made a more explicit representation concerning interest in the units in a November 18, 2005 e-mail, but this email cannot be the basis of a fraud claim because it was sent after the Damons had already entered into the Purchase Agreement.

The Court finds that this is a statement of opinion or the type of puffery than does not constitute fraud. *See Mutsch*, 430 N.W.2d at 204; *Am. Computer Trust Leasing v. Jack Farrell Implement Co.*, 763 F. Supp. 1473, 1487 (D. Minn. 1991), *aff'd sub nom. Am. Computer Trust Leasing v. Boerboom Int'l, Inc.*, 967 F.2d 1208 (8th Cir. 1992). Further, unlike representations relating to interest that has already been expressed in the units, these representations concern future expectations and are not grounds for fraud simply because the event does not occur. *Minn. Forest Prods., Inc. v. Ligna Mach., Inc.*, 17 F. Supp. 2d 892, 909 (D. Minn. 1998).

The fifth allegedly fraudulent representation is that each unit was 1,802 square feet, which was conveyed to the Damons in the handwritten Financial Analysis provided by Dan G. Defendants do not dispute that the units are, in fact, under 1,600 square feet, nor do they dispute that Dan G. edited his calculations on the Financial Analysis after meeting with the Damons, indicating his eventual awareness of the actual square footage. However, defendants contend that this misrepresentation fails to support a fraud claim because the Damons' reliance on the statement was not reasonable when they could have discovered the actual square footage if they had been reasonably diligent.[17]   They also contend that the Damons lack evidence that Dan G. knew the representation was false when he made it.

---

[17] The Realtor Defendants note that the Damons had access to the property between the September 7 meeting and the closing and that the Damons received paperwork that included floor plans from which they could have calculated the accurate square footage.

The Court will not find that the Damons' reliance on the square footage represented to them at the September 7 meeting was unreasonable as a matter of law.  As a general matter, "[w]hether a party's reliance is reasonable is ordinarily a fact question for the jury unless the record reflects a complete failure of proof."  *Hoyt Props, Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 321 (Minn. 2007).  As to the context of the present case, buyers in real estate transactions have "a right to rely upon the representations" of the seller's real estate agent.  *See Berryman v. Riegert*, 175 N.W.2d 438, 443 (Minn. 1970) ("Defendants had superior knowledge or at least the opportunity for knowledge of the problems which might be encountered in the purchase of the . . . home.  Because of plaintiffs' inexperience in this field, they had a right to rely upon the representations of defendants.").  On the facts of this case, a reasonable factfinder could find that it was reasonable for the Damons to rely on Dan G.'s representation.  Additionally, while there is no direct evidence that Dan G. was aware that the square footage was false when he made the representation, a reasonable jury could find that Dan G. made the representation "without knowing whether it was true of false," which could satisfy the knowledge element.  *See Specialized Tours*, 392 N.W.2d at 532.  Thus, the Court finds that the defendants are not entitled to summary judgment on the fraud claim premised on the square footage representation.

The sixth allegedly fraudulent statement is Dan G's assertion that the loan rate of 6.5% was only valid for sixty days.  Dan G.'s representation appeared in an email dated September 14, 2005.  However, the Damons learned the interest rate was available for longer than sixty days prior to entering the contract and still proceeded.  (Ms. Damon

Dep. 205.)  "[I]f a party who asserts fraud performs a contract and receives benefits from it after he determines the existence of fraud, he has waived the fraud or ratified the contract."  *Bond v. Charlson*, 374 N.W.2d 423, 429 (Minn. 1985).  Because the Damons learned that the assertion was untrue before they entered into the contract, a reasonable jury could not find that the Damons entered into the contract in reliance on the assertion.[18]

## F.      Fraudulent Nondisclosure

The Court will now turn to the Damons' fraudulent nondisclosure claim.  "For nondisclosure to constitute fraud, 'there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him.'"  *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 190 (Minn. 1999) (quoting *Richfield Bank & Trust Co. v. Sjogren*, 244 N.W.2d 648, 650 (Minn. 1976)).

> As a general rule, one party to a transaction has no duty to disclose material facts to the other.  However, [s]pecial circumstances may dictate otherwise.  For example: (a) One who speaks must say enough to prevent his words from misle[ad]ing the other party[;] (b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party[;] (c) **One who stands in a confidential or [f]iduciary relation to the other party to a transaction must disclose material facts**."

---

[18]  In accordance with the discussion above, the Damons' fraud claims based on the allegations at paragraph 82(b), (c), (e), and (f) of the third amended complaint survive summary judgment, but those based on the allegations at paragraph 82(a), (d), and (g) fail.

*Richfield Bank & Trust*, 244 N.W.2d at 650 (emphasis added) (citations and internal quotation marks omitted).  In addition to the duty to disclose element, the other elements of an ordinary fraud claim apply to a claim for fraudulent nondisclosure, including that the defendant intended for the plaintiff to rely on the omission, that the plaintiff reasonably relied on the omission, and that the plaintiff suffered pecuniary damages as a result.  *See Williams v. Heins, Mills & Olson, PLC*, No. A09-1757, 2010 WL 3305017, at *3 (Minn. Ct. App. Aug. 24, 2010).

The Court will first address the duty to disclose.  Under Minnesota law, "[a] fiduciary relationship is characterized by a 'fiduciary' who enjoys a superior position in terms of knowledge and authority and in whom the other party places a high level of trust and confidence."  *Carlson v. Sala Architects, Inc.*, 732 N.W.2d 324, 330 (Minn. Ct. App. 2007) (citing *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985)).  "[A]gency principles are preferred by the courts" as the mechanism by which a "fiduciary duty could be found to exist."  *PMH Props.*, 263 N.W.2d at 801.  Whether a fiduciary relationship exists is a question of fact.  *See Toombs*, 361 N.W.2d at 809.  Here, the Purchase Agreement indicated that Dan G. and Merl G. were the Damons' agents, which could support a finding of a fiduciary relationship.  Further, the Damons testify that they made clear to Dan G. that they placed their trust in him to guide them through the transaction, which could also support a finding of a fiduciary relationship.  *See Carlson*, 732 N.W.2d at 331 ("[W]hile a relationship might not be fiduciary per se, the facts of the case might create such a relationship.  Whether the facts here gave rise to a fiduciary relationship . . . is not an issue for resolution by summary judgment . . . ."); *see also Gibson v. Coldwell*

- 33 -

*Banker Burnet*, 659 N.W.2d 782, 788 (Minn. Ct. App. 2003) (discussing case-specific facts that gave rise to the creation of a fiduciary relationship between a real estate agent and client).

Having determined that genuine issues of material fact remain as to whether the Damons' relationship to the Realtor Defendants allows the Damons to advance a fraudulent nondisclosure claim, the Court will now turn to substance of the Damons' fraudulent nondisclosure claim to determine if it fails at this stage for other reasons. As with the fraud claim, the Damons point to several items that they believe amount to fraudulent nondisclosure, which the Court will address in turn. The Court will deny defendants' motions for summary judgment, though it will limit the Damons' claims substantially.

The Damons' first allegation is that Dan G. committed fraudulent nondisclosure by failing to inform the Damons that they could comply with the § 1031 like-kind sale requirements by simply identifying potential properties by their deadline and not actually purchasing them. The Realtor Defendants contend that this particular claim fails because the Damons retained a separate § 1031 broker that informed them of the specific ways to comply with § 1031. (*See* Mr. Damon Dep. 63; *see also* Fourth Renz Aff., Ex. I.) "Reliance in fraud cases is generally evaluated in the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 369 (Minn. 2009). The Court finds that it was unreasonable as a matter of law for the Damons to rely on Dan G.'s omission

when they had retained a separate broker specifically for the purpose of navigating the § 1031 process and that broker had informed them of the relevant rules.

The second alleged fraudulent nondisclosure is that Dan G. did not inform the Damons that other properties were available in the Rochester area in September 2005 that better met the Damons' expressed needs.   The Realtor Defendants do not move for summary judgment on this particular alleged omission.   In any event, the Court finds that a reasonable jury could find that Dan G. failed to mention other potentially suitable properties in a deliberate effort to induce the Damons to purchase Compark's property, and that Dan G.'s nondisclosure caused the Damons to purchase the building.

The Damons next allege that the Purchase Agreement was not signed prior to the September 8, 2005, deadline, and that the defendants' committed fraudulent nondisclosure when they failed to inform the Damons of this fact.   Defendants contend that this aspect of the Damons' fraudulent nondisclosure claim fails because (1) there is no affirmative evidence that the agreement was, in fact, not timely signed, and (2) the Damons closed on the building despite not having received a signed copy of the Purchase Agreement beforehand.   The Court finds that the second argument goes to the materiality of the alleged nondisclosure and entitles defendants to summary judgment with respect to this nondisclosure claim on the specific facts presented here.   The Damons assert that they requested for Dan G. to provide the signed Purchase Agreement to Ms. O'Donohoe and that Dan G. was required to do.   *See* Minn. Stat. § 82.71, subd. 4 (requiring real estate agents to provide documents including purchase agreements "at the time the documents are signed or become available").   The Damons assert, and defendants do not

dispute, that neither the Damons nor Ms. O'Donohoe received a signed copy of the Purchase Agreement or received confirmation that the Purchase Agreement had been accepted by Compark.   Nonetheless, the Damons closed on the building without inquiry or complaint.   The Court therefore finds that the alleged omission (*i.e.*, failing to inform the Damons that the Purchase Agreement may not have been signed by September 8) was immaterial.   The Damons have not presented credible evidence that would allow a reasonable jury to find that they would not have closed on the building had they been informed that the Purchase Agreement was signed prior to closing but after the deadline.

The Damons next make a series of allegations relating to an appraisal of the building that was allegedly conducted by Scott Renne at Associated Bank, which provided a loan to the Damons.   The Damons allege that defendants failed to disclose that the appraisal existed, that the appraisal was for an inflated amount, that Renne was involved in fraudulent activities, and that the analysis in the appraisal was materially deficient.   The Court finds that the allegations relating to the appraisal fail because Dan G. testified that he did not see the appraisal until the present action, (Dan G. Dep 148:24-150:25), and the Damons present no evidence that the Realtor Defendants had knowledge of any of information in question.

The Damons also allege that defendants committed fraudulent nondisclosure by failing to inform the Damons that the defendants had a financial interest in the other Commerce Park properties that would compete with the Damons' building for commercial tenants.   The Court finds that this allegation fails because the Damons acknowledge that Dan G. informed them at their initial meeting that he and Merl G. were

investors in Compark, the entity that owned the buildings in the development. (Ms. Damon Dep. 150:21-151:3, 389:9-11.)

Finally, the Damons allege that defendants failed to disclose the extent of the business relationships among the members of Compark, including the Realtor Defendants. The Court finds that the allegation fails because the Damons have presented no evidence that the relationships among the members of Compark would have been material to the Damons' decision to purchase the building or that Dan G. withheld information about those relationships in an attempt to induce the Damons' reliance.[19]

### G.    Civil Theft

Defendants move for summary judgment on the Damons' civil theft claim, brought pursuant to Minn. Stat. § 604.14, which provides, in relevant part:

> **Liability for theft of property.**  A person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater.

---

[19] The Damons also make an allegation relating to Daniel Berndt, an attorney and Compark member. The allegation asserts that Berndt represented both the Groteboers and Compark and Compark 6-2 at the closing. The Court fails to see how this fact would be material. The Realtor Defendants hypothesize that the Damons intended to allege that Berndt represented the Damons (as opposed to the Groteboers) as well as the sellers. The Damons do not offer a response or clarification. Even if this is the Damons' allegation, it fails because Ms. Damon testified that they initially thought that Berndt represented them at closing but they later learned that was not the case. (Ms. Damon Dep. 154:22-155:1.)

In accordance with the discussion above, the Damons' fraudulent nondisclosure claims based on the allegation at paragraph 83(b) of the third amended complaint survives summary judgment, but those based on the allegations at paragraph 83(a), (c), (d), (e), (f), and (g) fail.

Minn. Stat. 604.14, subd. 1.   The Compark Defendants move for summary judgment on the basis that the Damons consented to paying the purchase price and that the Compark Defendants had a "claim of right" to the purchase price based on the Purchase Agreement.

There is limited authority examining Minnesota's civil theft statute.   Although "a criminal complaint, conviction, or guilty plea is not a prerequisite to liability" for civil theft, *id.*, subd. 4, courts rely on the criminal theft statute to determine whether a defendant's conduct amounted to theft, *see Popp Telcom, Inc. v. Am. Sharecom, Inc.*, Civ. No. 96-1177, 2003 WL 1610789, at *9 (D. Minn. Mar. 20, 2003), *aff'd*, 361 F.3d 482 (8th Cir. 2004).   The criminal theft statute identifies a wide range of conduct that amounts to theft, including "swindling, whether by artifice, trick, device, or any other means." Minn. Stat. § 609.52, subd. 2(4).   Under Minnesota law, "the victim's receipt of something of value is not a defense to a charge of theft by swindle." *Popp Telcom*, 2003 WL 1610789, at *9.   The Minnesota Supreme Court has held that:

> A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value.   It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him.   That is the evil against which the statute is directed.

*State v. Lone*, 361 N.W.2d 854, 860 (Minn. 1985) (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)).   "[T]he gist of the offense is the cheating and defrauding of another by deliberate artifice" and "[n]o single definition can cover the range of possibilities for the offense." *State v. Ruffin*, 158 N.W.2d 202, 205 (Minn. 1968).

On the basis of the limited authority available, the Court finds that the Damons'

allegation that they were induced to part with the purchase price by fraud potentially fall

within the ambit of the civil theft statute.  Although the allegedly fraudulent acts were not

directly committed by the Compark Defendants, the Court found above that the Compark

Defendants are potentially liable for the fraudulent acts by virtue of an agency

relationship.  Thus, the Court will deny the Compark Defendants' motion for summary

judgment on the Damons' civil theft claim.[20]

## H.    Conversion

Under Minnesota law, conversion is "an act of willful interference with [the

personal property of another], done, without lawful justification, by which any person

entitled thereto is deprived of use and possession."  *Christensen v. Milbank Ins. Co.*, 658

N.W.2d 580, 585 (Minn. 2003) (alteration in original) (internal quotation marks omitted).

"Although consent is a defense to conversion, consent through fraud is ineffective.  Thus,

the commission of fraud may be sufficient interference with property to support a claim

---

[20] However, even though it was the Realtor Defendants who allegedly committed the fraudulent acts, the Court will grant the Realtor Defendants' motion for summary judgment on the civil theft claim on the ground that it was the Compark Defendants who actually obtained property from the Damons.  *See* Minn. Stat. § 609.52, subd. 2(4).

The Court notes that questions remain regarding how damages will be calculated should the Damons prevail on their civil theft claim against the Compark Defendants.  The civil theft statute allows for punitive damages up to 100 percent of the value of the stolen property, but it is not clear what portion of the purchase price would fairly be considered "stolen" in this case because the Damons did receive valuable property in exchange for the purchase price, they simply allege that it was not as valuable as they thought it was.

of conversion." *Tuaolo v. Want Some Weather, Inc.*, Nos. A07-2139, A08-0014, A08-0044, 2008 WL 5136614, at *4 (Minn. Ct. App. Dec. 9, 2008) (citations and internal quotation marks omitted).[21]

Defendants move for summary judgment on the basis that money cannot be the basis for a conversion action. The Court finds that defendants' contention is inconsistent with Minnesota law. For example, the Minnesota Court of Appeals affirmed a finding of liability for conversion in a case where the plaintiff alleged that he was fraudulently induced to invest $150,000 in a business venture. *See Tuaolo*, 2008 WL 5136614, at *1, 4. And this District recently rejected the identical argument raised by defendants in the present case after surveying Minnesota caselaw and locating several cases recognizing claims for conversion of money. *See Cummins Law Office, P.A. v. Norman Graphic Printing Co.*, 826 F. Supp. 2d 1127, 1133 (D. Minn. 2011).

Defendants point to a Minnesota Court of Appeals' decision that held that "[b]ecause cash is liquid and designed to be transferred, it is a subject of conversion only when it is capable of being identified, and described as a specific chattel." *Halla v. Norwest Bank Minn., N.A.*, 601 N.W.2d 449, 453 (Minn. Ct. App. 1999) (internal quotation marks omitted). However, *Halla* is distinguishable because the plaintiff was proceeding against a bank at which the alleged wrongdoer had deposited checks and cash,

---

[21] The Court need not decide at this stage whether the Damons must prevail on their fraud claim in order to potentially prevail on their conversion claim, or if it might suffice for them to prevail on one of their other claims, such as fraudulent nondisclosure or negligent misrepresentation.

as opposed to proceeding directly against the alleged wrongdoer.   *See id.* at 450.

Although the language quoted from *Halla* above could be read broadly, the Court will not

apply *Halla*'s rule to the present case because it appears to conflict with numerous more

recent Minnesota cases.   Thus, the Court will deny defendants' motion for summary

judgment on the Damons' conversion claim.[22]

## I.      Civil Conspiracy

To prevail on a civil conspiracy claim, a plaintiff must establish that defendants

"agreed to accomplish an unlawful purpose, and took concerted actions to achieve that

purpose."   *Marty H. Segelbaum, Inc. v. MW Capital, LLC*, 673 F. Supp. 2d 875, 880

(D. Minn. 2009) (citing *Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 41 N.W.2d

818, 824 (Minn. 1950)).   The plaintiff is required to establish that multiple defendants

agreed to commit a criminal act or intentional tort.   *See Senart v. Mobay Chem. Corp.*,

597 F. Supp. 502, 505 (D. Minn. 1984).   The conspiracy claim must be supported by

specific facts tending to show agreement and concerted action.   *In re TWJ Implants*

*Prods. Liab. Litig.*, 880 F. Supp. 1311, 1320 (D. Minn. 1995).

---

[22] Although the Court denies defendants' motion, it notes that the Damons' conversion claim may serve little practical purpose going forward.   On the facts of the present case, the Damons cannot prevail on their conversion claim unless they prevail on their fraud claim (or possibly one of their similar claims such as fraudulent nondisclosure or negligent misrepresentation).   But if the Damons prevail on one of their other claims, they will be entitled to compensation for that claim and proving their conversion claim will not entitle them to additional damages.   *See Tuaolo*, 2008 WL 5136614, at *7 (affirming the reduction of damages to $150,000 after a jury had awarded $150,000 for a breach of contract claim, $138,705 for a fraud claim, and $150,000 for a conversion claim); *see also Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 379 (Minn. 1990) ("Although we decide parallel actions can be maintained, we do not uphold double recovery for the same harm.").

In an earlier order denying defendants' motion to dismiss the civil conspiracy claim, the Court held that the Damons had pleaded enough facts to allow a "reasonable inference that an agreement existed between at least two defendants to accomplish an unlawful act, and that some conduct towards that act occurred." *Damon v. Groteboer*, Civ. No. 10-92, 2011 WL 886132, at *4 (D. Minn. Mar. 14, 2011). However, discovery is now complete and the Damons have not bolstered their allegations with specific facts that tend to show agreement and concerted action. In fact, Dan Penz and Dan G. testified that the Compark Defendants did not learn of the potential sale to the Damons until after the Damons had already met with Dan G. and signed the purchase agreement. (Penz Dep. 81:8-16; Dan G. Dep. 111:5-14.) The Damons stress that the allegedly inflated purchase price was suggested by Penz, (Seventh Weintraut Aff., Ex. 52 (Dep. of Merl Groteboer) 104-05), but this alone does not allow a reasonable inference that Penz or anyone from Compark agreed with Dan G. or Merl G. to induce the Damons to accept that price through fraud, misrepresentation, or other tortious conduct. The Damons further have not uncovered facts that would give rise to a reasonable inference that Dan G. and Merl G. consciously agreed to induce the Damons to purchase the building through tortious conduct. Because the Damons have not alleged sufficient specific facts to allow a reasonable inference that multiple defendants agreed to commit an intentional tort or a crime, the Court will grant defendants' motion for summary judgment on the civil conspiracy claim.

**J.      Piercing the Corporate Veil**

The Court must determine whether to grant the Compark Defendants' motion for summary judgment on the Damons' claim to pierce Compark's corporate veil and expose Compark's individual members to liability.    Determining whether to allow a veil-piercing claim to proceed requires a two-step inquiry under Minnesota law.  First, courts consider the following eight factors to determine whether the corporation functioned as a "mere instrumentality" of the individuals sought to be held personally liable:

> [I]nsufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely façade for individual dealings.

*Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979).  Second, "[d]isregard of the corporate entity requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness."  *Id.*   For the reasons explained below, the Court will grant the Compark Defendants' motion for summary judgment on the veil-piercing claim.

**1.      The *Victoria Elevator* Factors**

**a.      Insufficient Capitalization**

The first factor to consider is whether Compark was formed with insufficient capitalization.   "The adequacy of capitalization must be measured at the time of incorporation because it reveals whether the corporation was created to avoid liability." *NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 730 n.7 (8th Cir. 2008); *see also J-R Grain Co.*

*v. FAC, Inc.*, 627 F.2d 129, 135 (8th Cir. 1980).  At the time of formation, Compark's assets consisted of $2.7 million in contributions and Dan Penz's right to purchase the underlying land for $3.7 million.  The Damons contend the land was worth $3.7 million, because that is what Compark paid for the land, while Compark contends that the land was worth $8.3 million, based on an appraisal that was conducted prior to Compark seeking the $1.1 million loan.  (*See* Seventh Weintraut Aff., Ex. 58 at 7.)  As for debts, Compark had a $1.1 million loan at the time of its formation.

Even if the Court accepts the Damons' argument that the land was worth only $3.7 million, Compark's assets were more than three times greater than its debts. "Inadequate capitalization generally means capitalization very small in relation to the nature of the business of the corporation and the risks attendant to such businesses." *HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 938 (8th Cir. 2007) (internal quotation marks omitted).  Therefore, the Court finds that Compark was sufficiently capitalized.  *See Carpenter Paper Co. of Neb. v. Lakin Meat Processors, Inc.*, 435 N.W.2d 179, 183 (Neb. 1989) (discussing expert testimony that an assets to debt ratio of 2.7 to 1 is in the upper quartile).  Thus, the first factor does not support piercing the corporate veil.

### b.    Corporate Formalities

The second factor is failure to observe corporate formalities.  Here, among other things, Compark maintained a corporate bank account, filed tax returns, and maintained financial records.  Damon responds that Compark did not hold regular meetings, did not

take or distribute minutes at the meetings it did hold, and its only resolutions were for financing.  However, the Damons point to no precedent that would support finding a failure to observe corporate formalities on this record.  The second factor is concerned with more egregious departures from corporate formalities.  *See, e.g.*, *Cornerstone Home Builders, Inc. v. Guyers Dev., LLC*, A09-1178, 2010 WL 1541344, at *8 (Minn. Ct. App. Apr. 20, 2010) ("Appellants produced no business plan, maintained minimal financial records, and commingled corporate funds with another entity.  Additionally, appellants . . . avoid[ed] paying real-estate taxes on a multi-million dollar transaction.  There was also no record maintained of the purported $108,000 loan made . . . to the company.  The district court did not err in determining that this factor weighs in favor of piercing the corporate veil.").  Further, the absence of various formalities such as regular board meetings does not necessarily establish the second factor.  *See Almac, Inc. v. JRH Dev., Inc.*, 391 N.W.2d 919, 923 (Minn. Ct. App. 1986) ("The fact the board of directors never met does not mean the directors are not abiding by corporate formalities."), *superseded on other grounds by statute*, Minn. Stat. ch. 302A, *as recognized in Stone v. Jetmar Props, LLC*, 733 N.W.2d 480, 485 (Minn. Ct. App. 2007).  Thus, the Court finds that the second factor does not support piercing the corporate veil.

### c.    Nonpayment of dividends

The third factor is nonpayment of dividends, which the Damons argue is satisfied because it is undisputed that Compark did not pay dividends.  However, it is also undisputed that when Compark had profits, it used them to satisfy Compark's obligations

and fund construction.  *See Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863, 868 (Minn. 1981) ("Dividends were never paid, but this should be no complaint where the sole shareholder put all earnings back into the business.").   Thus, the Court finds that nonpayment of dividends in the present case does not support piercing the corporate veil.

### d.   Insolvency at time of transaction

The fourth factor is whether the company was insolvent at the time of the relevant transaction.   The Damons present Compark's net income in their own brief as approximately $300,000 for 2005 and approximately $1.2 million for 2006.   Because Compark's net income was positive for the years during which the transaction occurred, the Court finds that the fourth factor does not support piercing the corporate veil.

### e.   Siphoning of funds by dominant shareholder

The fifth factor is siphoning of funds by the dominant shareholder, which the Damons allege is present because Dan Penz's company, 4 TP, LLC, was paid $2.5 million by Compark when 4 TP, LLC relinquished its 47.5% interest in Compark less than two years after joining the company.   However, Compark responds that the buy-out was fairly negotiated and does not amount to siphoning, and the Damons present no evidence to the contrary.   *See Snyder Elec.*, 305 N.W.2d at 868 ("No siphoning of assets occurs if the transactions are for fair consideration . . . .").   Thus, the fifth factor does not support piercing the corporate veil.

### f.    Nonfunctioning officers and directors

The sixth factor is the presence of nonfunctioning officers and directors.   The Damons argue that Ed Lunn, Compark's CFO and Secretary, did nothing other than sign documents, but the Compark Defendants respond that it is typical for closed corporations to have nonfunctioning directors.   *See Snyder Elec.*, 305 N.W.2d at 868 ("This was a closed corporation and the fact the other two directors Fleming's wife and his attorney had a passive role is not inconsistent with this kind of corporation.").   Because the passive role of Compark's officers was typical for a corporation of its kind, the Court finds that this factor does not establish that Compark was a mere instrumentality of its individual members and, thus, does not support piercing the corporate veil.

### g.    Absence of corporate records

The seventh factor is the absence of corporate records, which the Damons contend is satisfied because Compark kept no minutes of its meetings and passed no resolutions for any business other than financing.   However, Compark maintained a check register, tax records, financial records, documents relating to sales and loans, and organizational documents.   The Court finds that Compark maintained sufficient corporate records to establish that this factor does not favor piercing the corporate veil.

### h.    Façade for individual dealings

The final factor relevant to determining if the company was a mere instrumentality of its individual members is whether it appears the company served as a façade for individual dealings.   Circumstances indicative of this factor include commingling of

personal and corporate finances, corporate property securing individual loans, or selling corporate assets to satisfy personal debts.  *See, e.g.*, *Urban ex rel. Urban v. Am. Legion Post 184*, 695 N.W.2d 153, 161 (Minn. Ct. App. 2005), *aff'd sub nom.*, *Urban v. Am. Legion Dep't of Minn.*, 723 N.W.2d 1 (Minn. 2006).

Here, Compark maintained a corporate bank account that was distinct from its members' bank accounts and no members used corporate property or assets for personal financial gain, but the Damons argue that the factor is satisfied because several Compark members gained personally from Compark when Compark engaged their various services.[23]  The Damons cite no authority for the proposition that a company becomes a mere façade for individual dealings when it utilizes the services of its members at market rates.  Thus, the Court finds that this factor does not support piercing the corporate veil.

### 2.      Justice and Fairness

Under Minnesota law, "[d]isregard of the corporate entity requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness."  *Victoria Elevator*, 283 N.W.2d at 512.  Here, because the Court finds that none of the *Victoria Elevator* factors support piercing the corporate veil, it need not address the second step of the analysis.  Where none of the factors indicate that the company's members abused the corporate form, it is not inappropriate for the

---

[23] The Damons allege that the Groteboers received commissions as real estate agents, Dan Berndt's law firm was paid for legal work, Alan Schaefer's accounting firm was paid for accounting work, and Bryan Schoeppner's construction company was paid for work in the development.

members to be shielded from individual liability.  *See id.* ("Doing business in a corporate form in order to limit individual liability is not wrong; it is, in fact, one purpose for incorporating.").   For these reasons, the Court will grant the Compark Defendants' motion for summary judgment on the Damons' veil-piercing claim.

### K.     Negligent Misrepresentation

The Realtor Defendants move for summary judgment on the Damons' negligent misrepresentation claim but do not address it in their brief, and the Compark Defendants move for summary judgment solely on the basis that they negotiated with the Damons at arm's length, which they contend precludes a negligent misrepresentation claim.

Under Minnesota law,

> [o]ne who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Bonhiver v. Graff*, 248 N.W.2d 291, 298 (Minn. 1976) (internal quotation marks omitted).   "A misrepresentation is made negligently when the misrepresenter has not discovered or communicated certain information that the ordinary person in his or her position would have discovered or communicated."  *Florenzano v. Olson*, 387 N.W.2d 168, 174 (Minn. 1986).  "[W]here adversarial parties negotiate at arm's length, there is no duty imposed such that a party could be liable for negligent misrepresentations."  *Smith v. Woodwind Homes, Inc.*, 605 N.W.2d 418, 424 (Minn. Ct. App. 2000) (internal quotation marks omitted).   However, where a special relationship exists (such as a relationship

between a client and the agent providing information to the client), there is a duty to avoid negligently giving false information.  *See Safeco Ins. Co. of Am. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 871 (Minn. Ct. App. 1995).

Here, the Court has found that there is at least a genuine issue of material fact as to whether the Realtor Defendants entered into an agency relationship with the Damons. And a reasonable jury could find that even if Dan G. did not actually know certain facts, (for example, the availability of other suitable buildings or the actual square footage of the units), he was negligent for not knowing those things and for failing to provide complete, accurate information to the Damons.  Because the Damons have a potentially meritorious negligent misrepresentation claim against the Realtor Defendants, and because the Court found above that genuine issues of material fact remain as to whether the Compark Defendants are liable for the representations of Dan G. and Merl G., the Court will deny the defendants' motions for summary judgment on the negligent misrepresentation claim.

### L.    Unilateral Mistake with Inequitable Conduct[24]

"Absent ambiguity, fraud, or misrepresentation, a mistake of one of the parties alone as to the subject matter of the contract is no ground for rescission."  *N. Star Ctr., Inc. v. Sibley Bowl, Inc.*, 205 N.W.2d 331, 332 (Minn. 1973).  However, a unilateral mistake claim fails "where the mistake of the party seeking it could have been avoided by

---

[24]    The Court dismissed the Damons' mutual mistake claim in a previous order.  *See Damon*, 2011 WL 886132, at *5

reasonable diligence." *Vallentyne v. Immigration Land Co.*, 103 N.W. 1028, 1029 (Minn. 1905). The Damons contend that they were mistaken as to the size and value of the building because the Realtor Defendants' fraudulently or negligently misrepresented the square footage in the Financial Analysis and based the building's income potential on the inaccurate square footage.

The Compark Defendants first argue that the "size" and "value" of the building were not terms of the Purchase Agreement. However if the mistake concerns "a fact material to the transaction," and is caused by fraud or misrepresentation, a unilateral mistake claim is viable, even if the mistake does not relate to a fact that appears as a term in the final contract. *N. Star Ctr.*, 205 N.W.2d at 332. Here, a reasonable jury could easily find that the size and value of the building were material facts.

The Compark Defendants also argue that the Damons did not exercise reasonable diligence to avoid any mistake regarding the building's square footage or value. They stress that the Damons received plans for the building from which they could have calculated the accurate square footage, the Damons could have visited the building again before closing to measure the square footage, and the Damons could have sought an appraisal of the building. The Court, however, concludes that a reasonable jury could find that the Damons acted reasonably in light of the fact that they received the inaccurate square footage and allegedly inaccurate value from Dan G., who may have been acting as their agent. *Cf. Berryman*, 175 N.W.2d at 443 ("Because of plaintiffs' inexperience in this field, they had a right to rely upon the representations of defendants."). For these

reasons, the Court will deny defendants' motions for summary judgment on the unilateral mistake claim.

## M.    Breach of Fiduciary Duty[25]

To prevail on a claim for breach of fiduciary duty, the Damons must demonstrate the existence of a duty, breach, causation, and damages. *See Hot Stuff Foods, LLC v. Dornbach*, 726 F. Supp. 2d 1038, 1043 (D. Minn. 2010). As to the existence of a duty, the Court noted above in discussing the Damons' fraudulent non-disclosure claim that genuine issues of material fact remain as to whether a fiduciary relationship existed between the Damons' and Dan G. and/or Merl G. *See Carlson*, 732 N.W.2d at 331 ("[W]hile a relationship might not be fiduciary per se, the facts of the case might create such a relationship. Whether the facts here gave rise to a fiduciary relationship . . . is not

---

[25] In response to the Compark Defendants' motion to dismiss, the Damons stated that "except for their breach of contract claim against [Realtor] Defendants, Damons have asserted all of their causes of action against all of the Defendants." (Pls.' Mem. in Opp. at 12, Apr. 21, 2010, Docket No. 23.) However, a Report and Recommendation ("R&R") addressing the motion to dismiss determined that the breach of fiduciary duty claim, like the breach of contract claim, referred only to the Realtor Defendants and was, therefore, not at issue in the Compark Defendants' motion. (Order & R&R at 2 n.3, Sept. 27, 2010, Docket No. 57.) The Damons did not object to this portion of the R&R and it was thus adopted by the Court. *Damon*, 2011 Wl 886132, at *6. Because of this, the Compark Defendants did not address the breach of fiduciary duty claim in their summary judgment brief other than to note the Court's earlier ruling. (Mem. in Supp. at 11 n.9, Aug. 9, 2012, Docket No. 151.) The Damons, apparently failing to take note of either the Court's earlier treatment of the fiduciary duty claim or the footnote in the Compark Defendants' brief, assert that the Compark Defendants did not address the fiduciary duty claim and urge the Court that it must not be dismissed against the Compark Defendants. (Mem. in Opp. at 11, Sept. 14, 2012, Docket No. 164.) However, based on the Court's prior conclusion, to which the Damons did not object, the Court finds that the breach of fiduciary duty claim applies only to the Realtor Defendants and will be dismissed with prejudice as to the Compark Defendants.

an issue for resolution by summary judgment . . . .").  If the Realtor Defendants were, in fact, serving as the Damons' real estate agents, certain duties accompany that role.  For example, "[a] real-estate agent owes a 'duty to communicate to the seller all facts of which [the agent] has knowledge which might affect the principal's rights or interests.'" *Hager's of Cohasset, Inc. v. Nelson*, No. A10-625, 2011 WL 500014, at *3 (Minn. Ct. App. Feb. 15, 2011) (alteration in original) (quoting *White v. Boucher*, 322 N.W.2d 560, 564 (Minn.1982)).  In addition to the duty of disclosure, the real-estate agent owes duties of good faith, loyalty, and care.  *White*, 322 N.W.2d at 564-65.

The Damons allege a multitude of breaches of fiduciary duty in their complaint and in an expert report that is referenced in the complaint.  (*See* Third Am. Compl. ¶¶ 156-60.)  The Realtor Defendants argue that the Damons' breach of fiduciary duty claim should be significantly narrowed.  The Court will grant in part and deny in part the Realtor Defendants' motion.

As an initial matter, the Court notes that there is substantial overlap between the acts that the Damons allege amount to breaches of fiduciary duty and the acts allegedly giving rise to nearly all of the Damons' causes of action.  The Court will focus here on acts that it has not already addressed in other sections of this Order.  For example, the Court will not readdress allegations relating to the square footage of the building, Dan G.'s alleged false promises to help the Damons find tenants by marketing the building, or Dan G.'s alleged failure to disclose other suitable properties that may have been available when the Damons met with Dan G.  Viewing the facts in the light most favorable to the Damons, a reasonable jury could find that these allegations amount to

breaches of the fiduciary duty of care or loyalty.  Additionally, a reasonable jury could find that the breaches caused the Damons damages because the Damons allege they would not have purchased the building, or they would have purchased it for less and hired a leasing agent sooner, had the breaches not occurred.

The first alleged breach of fiduciary duty that the Court has not addressed in other contexts is that the Purchase Agreement was inadequate in various ways, including lacking certain standard contingency clauses.  However, the Damons do not assert that any of the alleged inadequacies, by themselves, caused them damage.  Rather, the Damons argue that the Court should not isolate alleged breaches and require damages for each breach, but instead should view the facts holistically to determine whether the Damons were damaged.  The Court finds the alleged breaches of fiduciary duty are sufficiently discrete and unrelated that they must each, independently, satisfy the elements of a breach of fiduciary duty claim.  Here, because there is no evidence that the alleged flaws in the Purchase Agreement caused or even contributed to the Damons' damage, the Court finds that the claim for breach of fiduciary duty based on purported inadequacies in the Purchase Agreement fails.

The Damons also assert that the Groteboers breached unspecified fiduciary duties when they allegedly communicated to Compark that the Damons were purchasing the building as part of a § 1031 exchange with a short deadline.  They allege that they were damaged because the knowledge gave Compark leverage to set an inflated purchase price and refuse to negotiate.  However, the undisputed evidence establishes that the $1.2 million purchase price was set by Dan Penz **before** the Damons met with any of the

Realtor Defendants.  (Merl G. Dep. at 104-05.)  And the evidence also demonstrates that the Damons signed the Purchase Agreement on September 7 agreeing to pay the purchase price and did not attempt to negotiate with the sellers.  (*See* Ms. Damon Dep. 215.)  Thus, the Court finds that the claim for breach of fiduciary duty based on the Groteboers allegedly informing Compark that the Damons were making a § 1031 exchange fails because there is no evidence that it caused damages.

Finally, the Damons assert that Dan G. breached unspecified fiduciary duties by failing to inform the Damons that they could select up to three properties and eventually purchase only one in order to satisfy the requirements of the § 1031 exchange.  However, the Damons received clear notification of the rules and requirements for a § 1031 exchange from their separate § 1031 broker, (*see* Fourth Renz Aff., Ex. I), and the Damons asked Dan G. if other suitable properties were available.  A reasonable jury could not find that this breach, in particular, caused damage to the Damons.  If the Damons suffered damage as a result of any of the Realtor Defendants' alleged breaches of fiduciary duty, the damage was caused by the breaches described above, such as Dan G. providing inaccurate square footage of the building, Dan G.'s alleged false promises to help the Damons find tenants by marketing the building, or Dan G.'s alleged failure to disclose other suitable properties that may have been available.

For the reasons explained above, the Court will grant in part and deny in part the Realtor Defendants' motion for summary judgment on the Damons' breach of fiduciary duty claim.

### N.        Breach of Contract

The Damons' breach of contract claim is based on a purported contract between the Damons and the Realtor Defendants for the latter to act as the Damons' real estate agent and market the building to potential lessors.  The Damons admit that there was no written agreement.  They also concede that there was no discussion of how the Realtor Defendants would be compensated for their efforts to lease the building.  The Court will grant the Realtor Defendants' motion for summary judgment on the breach of contract claim because a contract cannot exist absent "a meeting of the minds concerning its essential elements."  *Minneapolis Cablesystems v. City of Minneapolis*, 299 N.W.2d 121, 122 (Minn. 1980).[26]

### O.        Unjust Enrichment

The Damons' next claim is that their purchase of the building for an inflated price resulted in unjust enrichment to the defendants.  Under Minnesota law, "[t]he existence of an express contract between the parties precludes recovery under the theories of quasi-contract, unjust enrichment, or quantum meruit."  *Sterling Capital Advisors, Inc. v.*

---

[26] The Damons contend that the reasoning above only addresses the purported contract to help lease the building and not the purported contract for the Realtor Defendants to act as the Damons' real estate agent, which the Realtor Defendants allegedly "breached when they breached their fiduciary duties and made the misrepresentations."  (Pls.' Mem. at 44.)  The Damons do not elaborate on how the alleged breaches of fiduciary duty or misrepresentations, each of which are independent causes of action that will go forward, constitute breaches of the purported contract.  Further, any damages flowing from it would be duplicative of damages to which they would be entitled for their other causes of action.  *See UFE Inc. v. Methode Elecs., Inc.*, 808 F. Supp. 1407, 1415 (D. Minn. 1992).

*Herzog*, 575 N.W.2d 121, 126 (Minn. Ct. App. 1998) (citing *Sharp v. Laubersheimer*, 347 N.W.2d 268, 271 (Minn. 1984)).   More broadly, the Minnesota Supreme Court has held that "[a] party may not have equitable relief where there is an adequate remedy at law available."  *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996).

Here, the Purchase Agreement is an express contract, which bars the Damons' unjust enrichment claim.  The Damons argue circularly that if they prevail on their claim that the Purchase Agreement is null and void then there would no longer be a contract precluding them from pursuing equitable remedies.  However, if the Damons successfully established that the Purchase Agreement was null and void, they would be entitled to rescission and there would no longer be a benefit retained by defendants warranting an unjust enrichment claim.  Further, the Damons have an adequate remedy at law because they have the opportunity to prevail on several of their claims grounded in law that will go forward.[27]  For these reasons, the Court will grant defendants motion for summary judgment on the Damons unjust enrichment claim.

---

[27] If the Damons do not prevail on their various claims grounded in law at trial, it would seem to establish that it is not unjust for defendants to retain the money they received from the Damons.  *See First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981) ("[I]t must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully.").

### P.    Promissory Estoppel

The elements of promissory estoppel are: (1) a clear and definite promise; (2) intended to induce reliance; (3) detrimental reliance by the promise; and (4) a legal finding by the Court that the promise must be enforced to prevent an injustice.  *Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992).  "[T]he doctrine of promissory estoppel only applies where no contract exists."  *Banbury v. Omnitrition Int'l, Inc.*, 533 N.W.2d 876, 881 (Minn. Ct. App. 1995) (citing *Sacred Heart Farmers Coop. Elevator v. Johnson*, 232 N.W.2d 921, 923 n.1 (Minn. 1975)).  Here, the purported promises are Dan G.'s promises to "take care of . . . the leasing of [the] condos" and to market the Damons' units and help find tenants.  (Pls.' Mem. at 10, Sept. 14, 2012, Docket No. 163.)

Defendants move for summary judgment on the ground that the alleged promises are not sufficiently clear and definite.  They rely on *Ott v. Target Corp.*, where this District rejected a promissory estoppel claim premised on a promise to "aggressively promote and advertise" a plaintiff's product.  *See* 153 F. Supp. 2d 1055, 1077 (D. Minn. 2001) ("[Defendant] argues that [Defendant]'s alleged promises to 'aggressively promote and advertise' [Plaintiff]'s dolls is not sufficiently clear and definite to support a claim of promissory estoppel.  The Court agrees." (citation omitted)).

The Court finds that the alleged promises, which are at least as vague as the promise in *Ott*, are not sufficiently clear and definite to support the Damons' claim. Additionally, while there is no contract potentially providing a legal remedy for the Damons in relation to the alleged promises, the Damons' fraud and misrepresentation claims provide adequate legal, as opposed to equitable, remedies.  *See Olson v.*

*Synergistic Techs. Bus. Sys., Inc.*, 628 N.W.2d 142, 152 (Minn. 2001) ("[P]romissory estoppel is a creature of equity."); *ServiceMaster of St. Cloud*, 544 N.W.2d at 305 ("A party may not have equitable relief where there is an adequate remedy at law available."). For these reasons, the Court will grant defendants' motion for summary judgment on the Damons' promissory estoppel claim.

### Q.    Miscellaneous Damages Issues

#### 1.    Rescission

The Court must determine whether the Damons will be entitled to rescind the Purchase Agreement if they prevail on any of their claims for which rescission is a potential remedy.   If rescission is granted, "the entire contract is voidable." *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 865 (Minn. 2011).   "Rescission is an equitable remedy." *Beck v. Spindler*, 99 N.W.2d 684, 685 (Minn. 1959).   Fraud may be grounds for rescission of a contract, but the right to rescind "may be lost where the buyer either affirms the transaction with knowledge of the fraud or . . . fails to disaffirm the transaction within a reasonable time after discovery of the fraud." *Hemming v. Ald, Inc.*, 155 N.W.2d 384, 386 (Minn. 1967).   Further, "a party seeking rescission of a contract must return, or offer to return, what he has received under it, and thus put the other party as nearly as is possible in his situation before the contract."

*Beck*, 99 N.W.2d at 685 (internal quotation marks omitted).[28]   The Court finds that genuine issues of material fact remain as to whether rescission is an appropriate remedy.

First, a reasonable jury could find that the Damons disaffirmed the transaction within a reasonable time after their discovery of the fraud.  "The determination of what is a 'reasonable time' in which to rescind a fraudulent transaction depends, first, upon a determination of when the fraud was in fact discovered and, second, a determination of what may be deemed a reasonable time subsequent to that point of time." *Hemming*, 155 N.W.2d at 386-87.  "The point of discovery is the time at which the buyer has actual knowledge of the nature **and extent** of the fraud." *Id.* at 387 (emphasis added).

Here, the Damons allegedly discovered the square footage discrepancy in December 2006, but they did not learn that other commercial properties had been available until July 2008, and they also discovered additional information that they believed was related to the extent of the fraud in April 2009 when Ms. Damon learned that the appraiser (Renne) had faced criminal charges for conducting fraudulent appraisals.  Although the Realtor Defendants claim the Damons gave no indication that

---

[28] The Compark Defendants argue that rescission is available only when enforcement of the contract would impose an "oppressive burden," but this stringent standard is inapplicable because it is drawn from a case where a party sought to "rescind a contract for a purely unilateral mistake . . . **not induced or contributed to by the other**." *Gethsemane Lutheran Church v. Zacho*, 104 N.W.2d 645, 649 (Minn. 1960) (emphasis added).  Similarly, the Realtor Defendants argue that rescission is unavailable if a party's mistake merely concerns value and the party receives materially what it intended to purchase, but this standard is also drawn from a case "where the means of information were open alike to both parties, and each was equally innocent, and there was no concealment of facts and no imposition." *Costello v. Sykes*, 172 N.W. 907, 908 (Minn. 1919).  The Court will focus in the main text on the standards that are applicable to the situation at hand where there are allegations of misconduct.

they would seek rescission until filing this action, the Damons allegedly conveyed their interest in undoing the transaction by asking Merl G. to ask Compark to buy the building back for the purchase price in July 2008.  (Ms. Damon Dep. 234:4-14.)  Because there are factual disputes concerning when the Damons made their desire to rescind known, the Court finds that summary judgment on this issue is inappropriate.

Second, although a party can lose the right of rescission by "treat[ing] the property as his [or her] own" after discovering the fraud, *Richardson v. Lowe*, 149 F. 625, 628 (8th Cir. 1906) (quoting *Shappiro v. Goldberg*, 192 U.S. 232, 242 (1904), the Court finds that the Damons' ongoing efforts to find tenants for their building does not necessarily prohibit them from seeking rescission because "[a] mere effort to avoid loss will not amount to a ratification," *Bergstrom v. Pickett*, 181 N.W. 343, 345 (Minn. 1921). Finally, the Compark Defendants claim that the Damons cannot return what they received under the contract because the Damons have paid for substantial build-outs and encumbered the units with leases.  However, the Damons are only required to put the Compark Defendants "as nearly as is possible" to their pre-contract state of affairs.

For these reasons, the Court finds that additional factual development and credibility determinations are required before it will be clear whether the equitable remedy of rescission is appropriate.

### 2.    The out-of-pocket rule

The Realtor Defendants contend that lost rents and interest on lost rents are not recoverable because damages for fraud or misrepresentation are limited by the "out-of-

pocket" rule.   Under this rule, "the damages are the difference between the actual value of the property received and the price paid for the property, along with any special damages naturally and proximately caused by the fraud prior to its discovery, including expenses incurred in mitigating the damages." *B.F. Goodrich Co. v. Mesabi Tire Co.*, 430 N.W.2d 180, 182 (Minn. 1988).   The out-of-pocket rule is distinguished from the benefit-of-the-bargain rule, which "allows the plaintiff to recover the difference between the value of the property received and the value to plaintiff that the property would have had if the representation had been true." *Id.*  Minnesota's adherence to the out-of-pocket rule is not iron-clad, however, and it does not apply "where th[e] rule would not restore the injured party substantially to her former position." *Id.* at 183.   According to the Minnesota Supreme Court, the out-of-pocket rule "works well where the plaintiff has received property in reliance on the misrepresentation, as in sales of goods or real estate," but the rule "works less well where . . . defendant's misrepresentation prevents plaintiff from taking measures to protect the value of property it already has." *Id.*

Here, the Court finds that the out-of-pocket rule might not restore the Damons to the position they would have occupied absent the alleged misrepresentations.   If the square footage misrepresentation were the only allegation, the out-of-pocket rule might be sensible.   However, the Damons do not simply allege that they overpaid.   They also allegedly were damaged by the Realtor Defendants' representations concerning marketing the building and finding tenants.   It was allegedly due to these representations that the Damons did not take steps to lease their building until February 2007, nearly one and a half years after closing.   While a jury will not be required to accept the Damons'

expert's calculations, which are premised on a 100% occupancy rate, the Court finds that prohibiting the Damons from seeking damages for lost rents would not restore the Damons to the position they would have occupied absent the alleged misrepresentations.[29]

### 3.    Costs incurred by Damon Center LLC

Lastly, the Realtor Defendants argue that the Damons cannot recover expenditures and losses incurred since the Damons formed Damon Center, LLC, because Damon Center is the appropriate party to seek those damages, not the Damons as individuals. *See* Minn. Stat. § 322B.20, sub. 3 (providing that LLCs "may sue and be sued").  The Damons explicitly state that they formed Damon Center in order to establish limited liability for themselves individually, yet they seek to recover damages incurred by Damon Center as individuals rather than in Damon Center's name.  While the Court understands the economic reality that Mr. and Ms. Damon, as Damon Center's sole members, contributed all of the funds at issue, it will not allow the Damons to take advantage of the corporate form to limit personal liability while simultaneously ignoring the corporate form when doing so allows them to profit personally.  *See Freedom Fin.*

---

[29] The Court notes that the Damons will not be allowed to recover money damages if they succeed on their rescission claim, nor will they be allowed to rescind the contract if they elect to recover money damages.  *See Anders v. Dakota Land & Dev. Co.*, 289 N.W.2d 161, 163 (Minn. 1980) ("One who has been induced to enter a contract by fraudulent misrepresentations may elect to rescind the contract or sue for damages.  If he pursues his damage claim and obtains judgment or compromises and settles that claim, he thereby ratifies and adopts the contract and thereafter cannot seek to rescind the contract for the same fraud.").

*Grp., Inc. v. Woolley*, 792 N.W.2d 134, 141 (Neb. 2010) ("[Plaintiff] may not attempt to use the corporate form of the LLC to shield itself from liability and then use the same corporate form as a sword to recover damages or enforce liability to the LLC.").[30]

Thus, as the action currently stands, the Court finds that the money damages the Damons may properly seek are those that the Damons incurred personally before they created Damon Center and transferred ownership of the building to the LLC. However, as the Damons have already set forth all the damages they would intend to seek, the Court suspects it would not work an injustice if Damon Center were added as a party. *See* Fed. R. Civ. P. 21 ("On motion **or on its own**, the court may **at any time, on just terms**, add or drop a party." (emphases added)). The Court will allow the parties to submit letter briefs, as described in the order section below, addressing this possibility.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Jacqueline Damon is **DISMISSED with prejudice** from the action.

---

[30] *See also Meyer v. Christie*, No. 07-2230, 2011 WL 2847463, at *3 (D. Kan. July 15, 2011) ("[T]he court declines to set the precedent plaintiffs seek here, which would allow the individual sole owner/members of an LLC to use the form of the business organization as a shield from liability at times and then argue that its existence is immaterial at others when it would be profitable."); *cf. Krueger v. Zeman Const. Co.*, 758 N.W.2d 881, 883, 890 (Minn. Ct. App. 2008) (holding that the sole member of an LLC lacked standing to bring a "business-discrimination claim" because "[a]ppellant's [LLC], and not appellant personally, entered into a contract with respondent").

2.      The Realtor Defendants' motion to dismiss [Docket No. 144] is **DENIED**.

3.      The Damons' objections [Docket No. 205] are **OVERRULED** and the Magistrate Judge's November 7, 2012 order [Docket No. 197] is **AFFIRMED**.

4. The Damons' and the Realtor Defendants' objections [Docket Nos. 206 and 207] are **DENIED as moot** and the Magistrate Judge's November 16, 2012 order [Docket No. 202] is **AFFIRMED**.

5.      The Realtor Defendants' motion for partial summary judgment [Docket No. 140] is **GRANTED in part** and **DENIED in part** as follows:

        a.      The motion is **GRANTED** as to the Damons' claims for consumer fraud (Count 1), deceptive trade practices (Count 2), civil theft (Count 5), civil conspiracy (Count 7), breach of contract (Count 13), unjust enrichment (Count 14), and promissory estoppel (Count 15).  These claims are **DISMISSED WITH PREJUDICE**.

        b.      The motion is **GRANTED in part** and **DENIED in part**, as described in the Memorandum Opinion above, as to the Damons' claims for fraud (Count 3), fraudulent nondisclosure (Count 4), and breach of fiduciary duty (Count 12).

        c.      The motion is **DENIED** as to the Damons' claims for conversion (Count 6), negligent misrepresentation (Count 9), and unilateral mistake (Count 10).

6.      The Compark Defendants' motion for summary judgment [Docket No. 149] is **GRANTED in part** and **DENIED in part** as follows:

a.      The motion is **GRANTED** as to the Damons' claims for consumer

fraud (Count 1), deceptive trade practices (Count 2), civil conspiracy (Count 7),

piercing the corporate veil (Count 8), breach of fiduciary duty (Count 12), unjust

enrichment (Count 14), and promissory estoppel (Count 15).   These claims are

**DISMISSED WITH PREJUDICE**.

b.      The motion is **GRANTED IN PART** and **DENIED IN PART**, as

described in the Memorandum Opinion above, as to the Damons' claims for fraud

(Count 3) and fraudulent nondisclosure (Count 4).

c.      The motion is **DENIED** as to the Damons' claims for civil theft

(Count 5), conversion (Count 6), negligent misrepresentation (Count 9), and

unilateral mistake (Count 10), and as to the Compark Defendants' claim that the

Court must dismiss for lack of jurisdiction.


7.      Within twenty-one (21) days from the entry of this Order, Mr. Damon shall

submit to the Court, and serve upon defendants, a letter brief not to exceed 1,500 words

arguing for or against the joinder of Damon Center, LLC in the present action.   Within

fourteen (14) days after service of the Mr. Damon's letter brief, the Realtor Defendants

and the Compark Defendants shall submit to the Court, and serve upon Mr. Damon, a

letter brief not to exceed 1,500 words in response.


DATED:  March 29, 2013                         s/ John R. Tunheim
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                 United States District Judge